No. 11.—WILLIAM CULBREATH, plaintiff in error, *vs.* JAMES M. and DANIEL G. CULBREATH, defendants.

[1.] Money paid by mistake of the law, may be recovered back in an action for money had and received, where there is a full knowledge of all the facts: *provided* that the mistake is clearly proven, and the defendant cannot, in good conscience, retain it.

[2.] Distinction taken between *ignorance* and *mistake* of the law.

[3.] A construction given to the maxim, *ignorantia juris non excusat.*

Assumpsit, in Harris Superior Court.   Decided by Judge ALEXANDER, March Term, 1849.

Obadiah M. Culbreath died intestate, leaving neither wife nor children.   His nearest of kin were seven surviving brothers and sisters, and the children of a deceased sister.   William Culbreath, the administrator, under a misapprehension of the law, divided the estate equally between the seven brothers and sisters, to the exclusion of the children of the deceased sister.   Subsequently, these children instituted suit against the administrator and recovered the one-eighth of the estate.

The present action was by William Culbreath against two of the distributees, to recover back the amount overpaid, on account of this mistake.

Upon an agreed statement of the facts in the Court below, the presiding Judge awarded a non-suit against the plaintiff, who appealed to this Court.

Culbreath *vs.* Culbreath.

M. J. CRAWFORD, for plaintiff in error.

The action for money had and received, is an equitable action, and lies to recover money which ought not, in justice, to be kept; it lies to recover money which, *ex æquo et bono*, the defendant ought to refund, and will be sustained and a recovery allowed, where a bill in Chancery would authorize a decree for the plaintiff. *Chitty on Con.* 474.

Wherever the plaintiff could recover in a Court of Equity, he can recover in an action for money had and received; and all that he is bound to show is, that he has equity and conscience on his side. 2 *T. R.* 153.

If a man pay money which the law would not compel him to pay, but which in equity and conscience he ought to pay, he cannot recover it back; such as a payment after a debt has been barred by the Statute of Limitations, or where a minor pays a debt contracted during his infancy. In both these instances the debtors are bound in morals, though not in law, for the payment of the money, and if they make it, they cannot afterwards maintain an action for money had and received, and recover the amount so paid, because they were honorably bound to pay as above stated, and the parties receiving violate no principle of equity in retaining it. Money paid by mistake, when there was no ground to claim it in conscience, then the party paying may sustain an action and recover it back. 3 *Mass.* 75. 4 *Ib.* 383. 1 *Kelly,* 25, 149. 1 *Term R.* 154.

Money paid by mistake alone may be recovered back. *Chitty on Con.* 475, *and note* 1. 4 *Mass.* 383. 2 *Cowper,* 565.

When a party pays money by mistake, with a full knowledge of all the facts, and intending to waive his legal right, then he cannot recover; but a waiver is absolutely necessary to prevent a recovery. 2 *Smith's L. Cases, top p.* 326.

Any payment made with knowledge of facts cannot be recovered, unless it is unconscientious to retain it. *Smith's L. Cases,* 2*d vol.* 328, *top p.*

An administrator who overpays distributees, may sustain an action compelling them to refund; so may an executor against legatees, and so they may, should debts be afterwards established against the representative, not known at the time of payment. 1 *vol.* 2 *book, Bl. Com. top p.* 414.

They may recover after a voluntary payment.   17 *Mass.* 384.

E. R. Brown, for defendant in error.

The plaintiff in this case seeks to recover back money *voluntarily* paid· to the defendants, with a full knowledge of all the *facts,* but, as he alleges, in *ignorance of the law.    Ignorantia juris excusat neminem, ignorantia facti excusat.* See 1 *J. C. R.* 516.   2 *J. C. R.* 51, 60.

The following position is sustained by all the authorities: that " Where there is *bona fides,* and money is paid with full knowledge of the facts, though there be no debt, it cannot be recovered back."   2 *Smith's L. Cases,* 324, '7, (*Marriot vs. Hampton,*) *and cases there cited.*

The same principle settled in 37 *E. C. L. R. Wilson vs. Ray,* 50. 10 *Adolphus & Ellis,* 82. See, also, 1 *E. C. L. R.* 143.   *Brisbane vs. Dacres,* 5 *Taunton,* 143.

*By the Court.*—Nisbet, J. delivering the opinion.

[1.] The judgment of *non-suit* was awarded by the Court below in this case, upon the following state of facts, agreed upon by the parties: " The actions were founded upon a voluntary payment made to each of the defendants by the plaintiff, as administrator of Obadiah M. Culbreath, deceased, of one-seventh part of said intestate's estate, as part of their distributive shares of said estate, *in ignorance of the law of distribution of estates.*   After the payments, the children of a deceased sister of the intestate, and also of the defendant's, in being at the time of the payments, and known and recognized as such children of a deceased sister of the intestate and of the defendants, brought suit against the plaintiff, as administrator aforesaid, to recover their distributive share of the estate of said intestate, it being one-eighth of said estate, and did recover.   The suits now pending, were brought by the plaintiff to recover of defendants their proportion of the over-payment to them."   Upon the hearing, the presiding Judge *non-suited* the plaintiff, with leave to move at the next term, to set aside the non-suit and reinstate the cases.   Which motion being made, was refused, and to that decision the plaintiff excepted.

Upon the hearing before this Court, it was conceded on both

Culbreath *vs.* Culbreath.

sides, that with a knowledge of all the facts, the plaintiff acted *upon a mistake of the law.* That was considered as proven. Believing that the defendants were entitled to the whole of the estate of his intestate, to the exclusion of the children of his deceased sister, through a mistake as to the law, he paid to them the share which was rightfully due to those children. They having sued and recovered of him their distributive share, he brings these actions to recover of the defendants the money so paid to them, through a mistake of the law. The question is, *can a party recover back money paid, with a knowledge of all the facts, through mistake of the law?*

We are fully aware that the authorities upon this question are in conflict, as well in England as in this country. Great names and Courts of eminent authority, are arrayed on either side. It is not one of those questions upon which the mind promptly and satisfactorily arrives at a conclusion. This is true in reference both to principle and authority. It is not surprising, therefore, that Judge *Alexander* and this Court should differ. I think, and I shall try to prove, that the weight of authority is with us. If it were not so—if authorities were balanced—we feel justified in kicking the beam, and ruling according to that naked and changeless equity which forbids that one man should retain the money of his neighbor, for which he paid nothing, and for which his neighbor received nothing : an equity which is natural—which savages understand—which cultivated reason approves, and which Christianity not only sanctions, but in a thousand forms ·has ordained. In ruling in favor of these actions, we aim at no visionary moral perfectibility. We feel the necessity of practicable rules, by which rights are to be protected and wrongs redressed. We know the necessity, too, of *general* rules, and how absurd would be that attempt, which seeks to administer the equity which springs from each and every case. The *insufficiency* which marks all law-givers, laws and tribunals of justice—makes *that* a hopeless thing. Still, where neither positive law, nor a well settled train of decisions, impose upon Courts a prohibition, they are at liberty, nay, bound to respect the authority of natural equity and sound morality. Where these are found on one side of a doubtful question, they ought to cast the scale. Moreover, we believe that the rule we are about to lay down, may be so guarded, as in its application to be both practicable and politic.

It is difficult to say that an action for the recovery of money paid by mistake of the law, will not lie upon those principles which govern the action of assumpsit for money had and received. Those principles are well settled, since the great case of *Moses vs. McFarlan, in* 2 *Burrow,* 1005. The grounds upon which that necessary and most benign remedy goes, are there laid down by Lord *Mansfield.* This claim falls within the principles there settled, and cannot be distinguished from cases which have been ruled to fall within them, but by an arbitrary exclusion. I am not now using the case of *Moses vs. McFarlan,* as the authority of a judgment upon the precise question made in this record; although Lord *Mansfield* there held, *that money paid by mistake* could be recovered back in this action, without distinguishing between mistake of law and fact. I refer to it, to demonstrate what are the principles upon which the action is founded. It is *not* founded upon the idea of a *contract.* In answer to the objection, that assumpsit would lie only upon a contract, express or implied, Lord *Mansfield* said, "If the defendant be under *an obligation,* from the ties of *natural justice,* to refund, the law implies a *debt,* and gives this action, founded in the *equity of the plaintiff's case,* as if it were upon contract." Again: " One great benefit derived to a suitor from the nature of this action is, that he need not state the special circumstances from which he concludes that, *ex æquo et bono, the money received by the defendant ought to be deemed belonging to him.*"

" The defendant, (says his Lordship, farther,) may defend himself by every thing which shows that the plaintiff, *ex æquo et bono,* is not entitled to the whole of his demand, or to any part of it." His summary is in the following words : " In one word, the gist of this action is, that the defendant, upon the circumstances of the case, is obliged, by the ties of natural justice and equity, to refund the money." In the language of the civilians, from whom Lord *Mansfield* borrowed many valuable principles, " *Hoc natura æquum est neminem cum alterius detrimento, fieri locupletiorem.*"

If there is justice in the plaintiff's demand, and injustice or unconscientiousness in the defendant's withholding it, the action lies; or, to use more appropriate language, the law will compel him to pay. Now, when money is paid to another, under a mistake as to the payer's legal obligation to pay, and the payee's legal right to receive it, and there is no consideration, moral, or hono-

Culbreath *vs.* Culbreath.

rary or benevolent, between the parties, *by the ties of natural justice*, the payer's right to recover it back is perfect, and the payee's obligation to refund is also perfect—it becomes *a debt*. It is a case fully within the range of the *ex æquo et bono* rule. This is that case. It falls within none of the exceptions mentioned by Lord *Mansfield*. It was not paid as a debt due in honor or honesty, as in case of a debt barred by Statute—it is not paid as a donation—it was not paid as a debt contracted in violation of public law; for example, money fairly lost at play. In all such cases it is *conscientious* for the defendant to keep it. In this case there is no right, or equity, or conscience upon which the defendant can plant himself. Why, then, is not the case of a payment by mistake of the law, within the principles of *Moses vs. McFarlan?*

Right here the argument might rest on principle. Just here the *onus* is cast upon the other side, to show how and why this case is distinguishable from other cases falling confessedly within the principles upon which the action for money had and received is based. We shall see upon what footing the distinction is placed by Lord *Ellenborough*. It is that of *policy*. The doctrine which I am now repelling, never was defended upon principle—it never can be. No *British* or *American Judge* ever attempted its defence on principle. It was ruled on policy, and followed upon the authority of a few precedents. A policy which, it must be conceded, does private wrong, for the sake of an alleged public good; or, I should more appropriately say, rather than risk a doubtful public evil. It was, no doubt, this view of the subject which startled the calm philosophical equity of *Marshall's* mind, when yielding, in *Hunt vs. Rousemanier*, to precedent, he still gave in his personal protest against the doctrine. For what he said in that case can be viewed in no other light than as a personal protest. It is wise, it is necessary for Courts to yield to established authority; but, inasmuch as the use of precedent is to illustrate principle, a single precedent, or a number of precedents should not control, when they are against principle.

We guard this doctrine by saying, that the action is not maintainable, where money is paid through *mere ignorance* of the law, or in fulfilment of a moral obligation, or on a contract against public law, or on any account which will make it consistent with equity and good conscience for the defendant to retain it. Nor

does the judgment of this Court embrace cases of concealment, fraud or misrepresentation.    They depend upon principles pecu- liar to themselves.    And farther, it is scarcely necessary to add, that a recovery cannot be had, unless it *is proven* that the plaintiff *acted upon a mistake of the law.*

[2.] There is a clear and practical distinction between *ignorance* and *mistake* of the law.    Much of the confusion in the books, and in the minds of professional men, upon this subject, has grown out of·a confounding of the two.    It may be conceded, that at first view, the distinction is not apparent; but it is insisted, that upon close inspection, it becomes quite obvious.    It has been ridiculed· as a quibble, but we shall see that it has been taken by able men, and acted upon by eminent Courts.    *Ignorance* implies passive- ness; *mistake* implies action.    *Ignorance* does not pretend to knowledge, but *mistake* assumes to know.    *Ignorance* may be the result of laches, which is criminal; *mistake* argues diligence, which is commendable.    Mere *ignorance* is no mistake, but a *mis- take* always involves ignorance, yet not that alone.    The differ- ence may be well illustrated by the case made in this record.    If the plaintiff—the administrator—had refused to pay the distribu- tive share in the estate which he represented, to the children· of his intestate's deceased sister, upon the ground that they were not entitled in law, that would have been a case of ignorance, and he would not be heard for a moment upon a plea, that being igno- rant of the law, he is not liable to pay interest on their money in his hands.    But the case is, that he was not only ignorant of their right in law, but believed that the defendants were entitled to their exclusion, and acted upon that belief, by paying the money to them.    The ignorance, in this case, of their right, and the belief in the right of the defendants, and action on that belief, constitute the mistake.

The distinction is a practical one, in this, that mere ignorance of the law is not susceptible of proof.    Proof cannot reach the convictions of the mind, undeveloped in action; whereas, a mis- take of the law, developed in overt acts, is capable of proof, like other facts.

[3.] The usual reply to all this, is the time-honored maxim," *ig- norantia juris non excusat.*"    We do not make void this maxim in any fair construction of it.    It is an indispensable rule of legal and social policy; it is that, without which_ crime could not be

Culbreath *vs.* Culbreath.

punished—right asserted, or wrong redressed.   What if its application does, in some cases, work injustice?   Its overruling necessity, and the vast preponderance of its benefits over its evils, have reconciled the civilized world to its immovable *status*, as a rule of action.   The idea of *excuse*, implies delinquency.   No man can be excused upon a plea of ignorance of the law, for disobeying its injunctions, or violating its provisions, or abiding his just contracts.   He is presumed to know the law, and if he does not know it, he is equally presumed to be delinquent.   I remark, to avoid misconstruction, that it is of universal application in criminal cases.   In civil matters, it ought not to be used to effectuate a wrong.   That is to say, it cannot be a sufficient response to the claim of an injured person, that he has been injured by his own mistake of the law, when the respondent, against conscience, is the holder of an advantage resulting from that mistake.   The meaning, then, of this maxim, is this: *no man can shelter himself from the punishment due to crime, or excuse a wrong done to, or a right withheld from another, under a plea of ignorance of the law.*   The maxim contemplates the punishment of crime, the redress of wrong, and the protection of rights.   Is it not unreasonable so to construe it, as to apply it to one who has not only done no wrong and withheld no right, but is himself the injured party, as in this case?   The plaintiff has violated no law, withheld no right from the defendants, and in no particular wronged them; but on the contrary, he has been injured to the extent of the money which they unrighteously withhold from him.   In this view of it, too, the public policy of the maxim is sustained.   I cannot see that its utility is lessened by this limitation of its application.   In the language of Sir *W. D. Evans,* " the effect of the doctrine is carried sufficiently far for the purposes of public utility, by holding that no man shall exempt himself from a duty, or shelter himself from the consequences of infringing a prohibition imposed by law, or acquire an advantage in opposition to the legal rights and interests of another, by pretending error or ignorance of the law.   2 *Pothier on Obligations, Appendix,* 297.

The distinction between ignorance and mistake of the law, is recognised by Lord *Roslyn* in *Fletcher vs. Talbot,* 5 *Vesey,* 14 ; by Lord *Manners,* in *Leonard vs. Leonard,* 2 *Ball & Beatty,* 180, '3 ; by the Court of Appeals of South Carolina, in *Lawrence vs. Bedu-*

*bien,* 2 *Baily's R.* 623; and in the *Executors of Hopkins vs. Ma-zyck et al.* 1 *Hill's Ch. R.* (*S. C.*) 251.

In England, the authorities are pretty nearly in equilibrio, yet I must think that the preponderance, taking the cases at Law and in Equity together, is on the side of the principle which I am laboring to establish. This action for money had and received, is an equitable remedy, and lies generally where a bill will lie; decisions, therefore, in Chancery which recognize the principle, may be justly held to sustain it. The first case, then, in order of time, is that of *Lansdown vs. Lansdown,* reported in *Mosely,* 364, decided by Lord Chancellor *King.* That case was this—the second of four brothers died siezed of land, and the eldest entered upon it. But the youngest also claimed it. They agreed to leave the question of inheritance to one Hughes, a schoolmaster, who determined against the eldest brother, on the ground that lands could not *ascend.* Whereupon, the eldest agreed to divide the estate, and deeds were executed accordingly. Lord *King* decreed that they should be delivered up and cancelled, as having been obtained by mistake. There is no doubt whatever, but [the mistake was one of law as to the legal rights of the elder brother. It is a case in point. It is true that it has been greatly criticised. *Mosely,* the reporter, has been charged with inaccuracy, and was very much in disfavor with Lord *Mansfield.* Indeed, it is said that his Lordship did, on one occasion, order his reports not to be read before him. Yet there stands the case, and if supported by nothing else, it is sustained by its reasonableness. Judge *Marshall,* in referring to it, says, that it cannot be wholly disregarded.

The case of *Bize vs. Dickason,* was decided by Lord *Mansfield* in the Court of King's Bench. The judgment of the Court was delivered as follows : " The rule has always been, that if a man has actually paid what the law would not have compelled him to pay, but what in equity and conscience he ought, he cannot recover it back again in an action for money had and received. So, where a man has paid a debt which would otherwise have been barred by the Statute of Limitations, or a debt contracted during his infancy, which in justice he ought to discharge, though the law would not have compelled the payment, yet the money being paid, it will not oblige the payee to refund it; but where money is paid *under a mistake, which there was no ground to claim in con-*

*science*, the party may recover it back again in this kind of action." (1 *T. R.* 285. *

This authority is incontrovertible, and has not been controverted. The case made shows a mistake of law. The mistake spoken of by Lord *Mansfield*, could not have been a mistake of facts, because the case exhibits no mistake of facts, but does exhibit a mistake of the law.

The principle was sustained by a decree in *Bingham vs. Bingham*, 1 *Vesey, Sen.* 126. There, the bill was filed on the ground of a mistake in law. The Master of the Rolls said, " Though no fraud appeared, and the defendant apprehended he had a right, yet it was a plain mistake, such as the Court was warranted to relieve against, and not to suffer the defendant to run away with the money in consideration of the sale of an estate to which he had no right." See the note to this case in *Betts' Supplement*, 79, which shows the mistake to have been one of law. Also recognized in *Turner vs. Turner*, 2 *Ch. R.* 154, in *Leonard vs. Leonard*, 2 *Ball & Beatty*, 171, by Lord *Manners;* by Lord *Thurlow*, in *Jones vs. Morgan*, 1 *Bro. C. C.* 219, and by Lord *Eldon*, in *Stockly vs. Stockly*, 1 *Ves. & Beame*, 23, 31, and in *Anchor vs. The Bank of England, Doug.* 638.

To these authorities may be added the *dicta* of Lord Ch. J. *DeGray*, in *Farmer vs. Arundel*, (2 *Black. R.* 824,) who declared, " That where money is paid by one man to another on a mistake, either of fact or of law, or by deceit, this action will certainly lie." Of Lord *Kenyon*, in the case of *Chatfield and Paxton*, (see *Chitty on Bills*, 102,) and of *Chambre*, J. in *Brisbane vs. Dacres*, (5 *Taunt.* 157.) This Judge, arguing the point with great strength, says, " It seems to me a most dangerous doctrine, that a man getting possession of money to any extent, in consequence of another party's ignorance of the law, cannot be called on to repay it." He illustrates by putting the very case made in principle in this record. "Suppose (says he) an administrator pays money, *per capita*, in misapplication of the effects of the intestate, shall it be said that he cannot recover it back?"

Opposed to this weight of authority in England, stand the two cases of *Bilbie vs. Lumley*, (2 *East*, 469,) and *Brisbane vs. Dacres*, (5 *Taunt.* 157,)—in the latter case *Chambre*, J. dissenting—and the *obiter* opinion of *Buller*, J.

It is worthy of remark, that Lord *Ellenborough*, who presided

in *Bilbie vs. Lumley*, afterwards in *Penott vs. Penott*, (14 *East*, 423,) holds language irreconcilable with his opinion in that case. In the latter case, he is reported to say, " Mrs. Territt either mistook the contents of her will, which would be a mistake in fact, or its legal operation, which would be a mistake in law, and in either case we think the mistake annulled the cancellation." Thus it is manifest that our judgment in this case is not without precedent in the English books.

The authority of *Bilbie vs. Lumley*, has been followed in this country, by Chancellor *Kent*, (*Shotwell vs. Mundy*, 1 *John. Ch. R.* 512, *Lyon vs. Richmond*, 2 *John. Ch. R.* 51, 6 *Ib.* 169, 170,) and by the Supreme Court, in *Hunt vs. Rousmanier*, (1 *Peters*, 1.) In the same case, however, in 8 *Wheat.* 215, Ch. J. *Marshall* says, " Although we do not find the naked principle, that relief may be granted on account of ignorance of the law, asserted in the books, we find no case in which it has been decided that a plain and acknowledged mistake in law is beyond the reach of Equity." The case in 1 *Peters*, 1, was decided, however, upon other principles than that one now under discussion. The same may be said of the cases in *Johnson's Chancery Reports*, above referred to. Yet it may not be denied but that the Courts there recognise the rule as settled in *Bilbie vs. Lumley*. It may be questioned whether the recognition of that authority by the *Supreme Court*, is worth as much as the opinion of Ch. J. *Marshall*, intimated so plainly in the above extract, as to the rule in Chancery. The leaning of Mr. J. *Story*, in his Commentaries on Equity, is the same way ; and yet he says, "It has been laid down as unquestionable doctrine, that if a party, acting in ignorance of a plain and settled principle of law, is induced to give up a portion of his indisputable property to another, *under the name of a compromise*, a Court of Equity will relieve him from the effect of his mistake." *Story's Com. vol.* 1, §121.

Why it is that a party may be relieved from the consequences of a mistake of the law, where he gives up his property, *under the name of a compromise*, and not under other circumstances, it is difficult to see.

Mistake of the law has been held without relief in Illinois, (3 *Gilman*, 162,) in Tennessee, (8 *Yerger*, 298,) in New Jersey, (1 *Green's Ch. Rep.* 145,) and in Alabama, (9 *Ala.* 662,) and it may be elsewhere, beyond my time for ascertainment.

Culbreath *vs.* Culbreath.

The contrary was expressly ruled by the Court of Appeals in South Carolina, in *Lowndes vs. Chisolm,* (2 *McCord's Ch. R.* 455,) in 1827. This was followed by the great case before the same Court in 1832, of *Lawrence vs. Beaubien.* I call it *great,* because of the affluence of learning displayed in the argument by Messrs. Holmes and King on one side, and Pettigru and Bailey on the other, and because of the perspicuous condensation and ability of the opinion of Mr. J. *Johnson.* The doctrine, in all its bearings, is there discussed with extraordinary power, and the Court unanimously decided, that "A mistake of law is a ground of relief from the obligations of a contract, by which one party acquired nothing, and the other neither parted with any right, nor suffered any loss, and which, *ex æquo et bono,* ought not to be binding; and that it makes no difference that the parties were fully and correctly informed of the facts, and the mistake as to the law was reciprocal; but there must be evidence of a palpable *mistake,* and not mere *ignorance* of the law." The case of *Lawrence vs. Beaubien* was reviewed in 1833, by the Court of Appeals, in *Executors of Hopkins vs. Mazyck and others,* and its doctrines affirmed. 1 *Hill's Ch. R.* 242. So that in South Carolina the question is definitely settled. So, also, in Massachusetts, in the same way. See *May vs. Coffin,* 4 *Mass.* 342. *Warder vs. Tucker,* 7 *Mass.* 452. *Freeman vs. Boynton,* 7 *Mass.* 488. See, also, *Haven vs. Foster,* 9 *Pick.* 112.

The writers on the Civil Law are divided as to the question whether money paid under a mistake of the law, is liable to repetition. *Vinnius* and *D'Aguesseau* hold the affirmative; so Sir *W. D. Evans.* The argument of the great French Chancellor, *D'Aguesseau,* is, to my mind, unanswerable, (which see in 2 *Evans' Pothier, Appendix,* 308.) *Pothier* and *Heineceius* maintain the negative; and it is said that the text of the Roman Law is with them. See *Rogers vs. Atkinson,* 1 *Kelly,* 25, 26. *Collier vs. Lanier,* 1 *Kelly,* 238.

Let the judgment of the Court below be reversed.