Biciiabdson, Ob. J.,
delivered tbe opinion of tbe court:
Tbe first question arising in this case is whether or not tbe proviso of section 2357 of tbe Bevised Statutes applies to tbe desert-land act of 1877, March 3 (chapter 107,1 Supp. to Kev. Stat., 2d ed., p. 137). Tbe section is as follows:
a Sec. 2357. The'price at which tbe public lands are offered for sale shall be one dollar and twenty-five cents an acre; and at every public sale the highest bidder, who makes payment as provided in tbe preceding section, shall be tbe purchaser; but no land shall be sold, either at public or private sale, for a less price than one dollar and twenty-five cents an acre; and all the public lands which are hereafter offered at public sale, according to law, and remain unsold at the close of such public sales, shall be subject to be sold at i>rivate sale, by entry at the land office, at one dollar and twenty-five cents an acre, to be paid at the time of making such entry :
“Provided, That the price to be paid for alternate reserved lauds along the line of railroads within the limits granted by any act' of Congress shall be two dollars and fifty cents ppr acre.”
This section is reproduced from the. Act of 1.8.20, April 24, chapter 51, section 3 (3 Stat. L., 58G). At the time of the passage of that act the whole policy of the Government; in relation to the disposal of public lands consisted in offering the lands at public or private sale for cash only. The second section of the act (nowBev. Stat., sec. 2350) expressly provided that credit should not be allowed for the purchase money of any of the public lands.
In 1841 Congress began to make other provisions for the disposal of such lands. By the act of 1841, September 4, ch. 16, section 10 (5 Stat. L., 455), it was provided that any citizen of the United States, or any person who had declared his intention to become such, being the head of a family, or widow, or single man over the age of twenty-one years, who made settlement on such lands, inhabited and improved the same, and erected a dwelling thereon, might enter with the register of the land office any number, not exceeding one hundred and sixty acres, upon paying the minimum, price therefor. (Now Bev. Stabs., §§ 2257, 2258, 2259, 2260, 2261.) This was the first of the preemption laws.
Subsequently, in reserving lands in grants to railroads, Congress provided that the lands so reserved should not be sold for less than double the minimum price of the public lauds when *136 sold after having been offered for sale to tbe highest bidder. (10 Stat. L., ch. 45, § 3, p. 9; ch. 72, § 2, p. 302; 11 Stat. L., ch. 28, § 2, p. 9; ch. 31, § 2, p. 16; ch. 41, § 2, p. 17, and other acts.) From these acts came the use of the phrase, “ double-minimum lauds.”
In 1862 Congress adopted the policy of disposing of public lands to citizens who entered thereon for the purpose of obtaining homesteads. {Act of 1862, May 20, ch. 75, and subsequent acts, now Eev. Stats., §§ 2289-2317.) These acts make special provisions on the subject different from those existing in 1820 in relation to the sale of public lands.
They allowed an entry to be made on payment of $5 where the quantity of land was less than 80 acres, and $10 where it was more than 80 acres. (Eev. Stats., § 2290.) At the end of five years, upon proof that the person making such entry has resided on or cultivated the land for the term of five years immediately previous thereto, and upon making affidavit of other facts as therein specified, he is entitled to a patent without further payment. At the end of three years of such residence he might receive a patent, without further payment, upon proof that he has had under cultivation for two years one acre of timber for each sixteen acres. {Act of 1873, March 3, ch. 277,17 Stat. L., 605, now Eev. Stat., § 2317.)
In 1873 Congress entered upon an additional policy. By the Act of March 3, chapter 277, entitled “An act to encourage the growth of timber on the Western prairies,” Congress provided, as reproduced in the Bevised Statutes, that—
“Sec. 2464. Every person who plants, protects, and keeps in a healthy growing condition for ten years forty acres of timber, the trees thereon not being more than twelve feet apart each way, on any quarter section of any of the public lands, shall be entitled to a patent for the whole of such quarter section at the expiration of ike ten years, on making proof of such fact by not less than two credible witnesses: Provided, That only one quarter section in any section shall be thus granted.
“ Sec. 2465. Every person applying for the benefit of the preceding section shall, upon application to the register of the land office in which he is about to make such entry, make affidavit before the register or receiver that such entry is made for the cultivation of timber, and upon filing his affidavit with the register and receiver, and on payment of ten dollars, he shall thereupon be permitted to enter the quantity of land specified.
*137 “Sec. 2400. No certificate shall be given or patent issue therefor until the expiration of at least ten years from the date of such entry; and if, at the expiration of such time or at any time within three years thereafter, the person making such entry or, if he be dead, his heirs or legal representatives, shall prove by two credible witnesses that he has planted, and for not less than ten years has cultivated and protected such quantity and character of timber, he shall receive the j>atent for such quarter section of land.”
It will be observed that this act allowed the benefit of the provisions to “every person” without requiring citizenship or residence, and that upon payment of ten dollars at the time of entry he becomes entitled to a patent at the end of ten years upon proof that he has planted, cultivated, and protected timber according to the provisions of the act, without further payment.
With all these provisions the Government found itself in possession of much desert land which had not been sold for cash or taken up under the preemption or homestead laws.
As to such lands in certain States and Territories named, Congress entered upon still another policy, by offering the same to citizens upon quite different terms, as set out in this act of 1877, March 3, chapter 107, now under consideration (1 Supp. Eev. Stat., 2d ed., p. 137), upon which the present action is founded.
This act provides that any citizen, or person who has duly filed his intention to become such, without any requirement as to family or age, upon payment of twenty-five cents per acre, may file a declaration, under oath, with the register and receiver of the district where the land is situated, that he intends to reclaim a tract of desert land, not exceeding one section, by conducting water upon the same within a period of three years thereafter, and that at any time within three years thereafter, upon satisfactory proof of the reclamation of the land as therein provided, upon payment of the sum of one dollar per aere, a patent for the same shall be issued.
There is no proviso like that in section 2357 of the Revised Statutes, and no reference to “minimum price,” as in the preemption statutes, nor to the “ double-minimum price,” as in the land-grant statutes. The amount to be paid is expressly fixed by the act itself, and the whole consideration is entirely independent of the provisions of any other public-land laws. Pur *138 chasers are not required to look back a half century to the statutes of 1820, euacted upon a different policy of the Government, for any of the terms on which sales may be made. The act of 1877 .itself contains specifically all the terms of the offer of the Government.
Such was the construction given by the Interior Department immediately upon the passage of the act, as appears by the circular of March 12, 1877, set out in finding i, last clause, there l>rinted in italics. This decision was contemporaneous, having been made only nine days after the passage of the act, when the public officers charged with its execution better understood its objects than those who years afterwards come to administer it, and was followed by the Department for more than ten years thereafter. It is therefore entitled to the benefit of the ruling of the Supreme Court in the case of Edwards’s Leasees v. Darby (12 Wheat., 210), which has been repeatedly cited with approval by that court and many other courts, and has become a familiar principle of law. (United States v. Union Pacific R. It., 37 Fed. E., 555; Rand v. United States, 38 Fed. R., 667.) The court there said:
“ In the construction of a doubtful and ambiguous law the contemporaneous construction of those who were called upon to act under the law and were appointed to carry its provisions into effect is entitled to very great respect.”
It was not till more than ten years later, June 27,1887, that another Secretary issued a circular, set out in finding ir, addressed to the registers and receivers, raising the price' to just double that expressed in the act of 1877, as set out in the third paragraph, therein printed in italics.
In January, 1892, the then Secretary of the Interior, in answer to a letter of the Commissioner of the General Land Office asking instructions on the subject, made a ruling, set out in finding m, reversing the decision of his predecessor in 1887, and returning to that of 1877 and the former practice.
In September, 1893, still another Secretary, on an application for refund of the excess overpaid, emphatically adhered to the later decision, as appears by said finding in. (Decisions of the Department of the Interior relating to public lands, vol. 14, pp. 75, 76.; vol. 17, p. 339.)
In these latest two decisions reference is made to the Act of 1891, March 3, chapter 561 (1 Suppl. to Rev. Sta-t., 2d ed., p. 940). *139 But that act made no change in the requirements of the previous statute as to the amounts- to be paid the Government. It adds six new sections, extending the provisions to Colo-ardo, and making some alterations not relating to the money to be paid.
The practice of the Department is now what it was the first ten years after the passage of the act.
There is no question of repeal involved in the- case. It is not claimed by anybody that the proviso of the act of 1820, found in Revised Statutes, § 2357, has been repealed; the only question is as to its application to a later act. It seems to us clear that the proviso applies to the disposal of .public lands at auction or private sale for cash, according to the existing public-policy at that time, and not to any additions made thereto, and has no application to the disposition of lands under the desert-land act passed many years thereafter upon a different policy and for a different purpose. We hold with the Secretaries of the Interior of 1877,1892, and 1893, that a purchaser was bound to pay no more than was required by the act of 1877. All in excess of that amount exacted of him was an overpayment.
It remains to be considered whether or not such overpayment was so far voluntary and in mistake of law on his part that he can not recover it back in an action of law.
As was said substantially in a former case cited and adopted in Msworth’s Oase (14 O. Cls. R., 382, 394) that the general rule of the common law is that money paid in mistake of law, when all the facts are known to the parties, and there is no fraud, can not be recovered back. This rule is founded on the maxim of the civil law, u ignorantia legis neminem excusat,” which, in its application to the administration of the law of crimes and offenses, is a concise and correct enunciation of a sound principle of public policy. But when made the foundation of a rule that money paid in mistake of law can in no case be recovered back unless fraud is proved, its application seems to be extended far beyond justification.
When one has committed a crime or offense, and has thereby done injury to persons and a wrong to the state, he may well be confronted with the maxim that “ ignorance of the law excusesno one,” and with justice may be compelled to submit to the penalty which the law imposes upon him for his wrongful act. But when one pays, in mistake of law, money which he *140 does not owe, and which the receiver has no right in justice and conscience to retain, he does not commit a wrong, and is not estopped from recovering back what is paid; it is the receiver who does a wrong, and attempts to excuse it on the ground of mistake on the part of the person whose money he unjustly received and retains.
The rule has often been presented to courts in cases in which its application would work manifest hardship, injustice, and wrong; to obviate which it has been denied or explained away, and sometimes a nice distinction drawn between ignorance and mistake of law, by which the rule was held to be restricted to cases of ignorance, and not to apply to cases of mistake. This distinction, although supported by strong reasons, is too subtle to be of much practical importance. The Supreme Court, in recognizing the rule, at the same time recognizes the fact that it has exceptions and limitations. (Hunt v. Rousmainer’s Administrators, 1 Peters, 15; Bank of the United States v. Daniel, 12 Peters, 48.)
It has been held that money ma.y be recovered back in an action for money had and received in mistake of law where • there is a full knowledge of all the facts if the mistake is clearly proved, -and the defendant can not under all the circumstances in good conscience retain' it; and, as obviating the necessity of exceptions and subtle distinctions, this would seem to be a better rule, and it is supported by many authorities. (See, among other cases, Northup v. Graves, 19 Conn., 554; Culbreath v. Culbreath, 7 Ga., 64; Stedwell v. Anderson, 21 Conn., 139; Underwood v. Brochman, 4 Dana, 309; Hopkins v. Mazyck, 1 Hill, Ch. R., 242; Lawrence v. Beaubien, 2 Bailey, 623; Lowndes v. Chisolm, 2 McCord, Ch. R., 455; Robinson v. City Council, 2 Rich., 317, 320; Farmer v. Arundell, 2 Wm. Black, 825; Moses v. Macfarlan, 2 Burr, 1002. )
But perhaps the most correct rule would be that where the law is misettled and in doubt money so paid in mistake of the true construction may be considered in the nature of a compromise, and so not to be recovered back unless it be paid between persons who do not stand on an equal footing. (Morgan v. Palmer, 2 Barn & C., 720; Steele v. Williams, 8 Wells; Hurl & Gard, 625, 1 Smith’s Leading Cases, part 2,440 and 428; Kinney v. Dodge, 101 Ind., 573; United States v. Lawson, 101 U. S., 164; Swift Co. v. United States, 111 U. S., 22; Elsworth’s Case, *141 14 C. Cls. R., 384, affirmed by the Supreme Court, 101 U. S., 170.)
There can be no doubt that the parties in this case did not stand on equal footing. The claimant was a private citizen, without power in the matter. The receiver was a public officer, bound to follow the instructions of his superior. The claimant desired to obtain a patent for certain desert land. He had a right to do so on terms offered by the desert land act of 1877. When he went to the office of the register he found that he could not have the land on the terms offered, but was required to pay double the amount therein specified. What was he to do? He might have protested to the receiver, but was not obliged to do so. No statute required a protest for the foundation of an action, as in the payment of customs duties. (Eev. Stats., §§ 3011,3012.)
The object of a protest not required by statute is to give the receiver of the money an opportunity to recede from his demand. But the receiver in this case was a subordinate public officer, acting under general instructions from his superior, over which he had no control. To have protested then and there would have been an idle proceeding, and the law does not require proceedings which are merely useless. Should he have protested to the Secretary of the Interior? He knew that the Secretary had by law supervision of Government business in relation to the public lands, and had his office in Washington, thousands of miles away. He knew that the Secretary had made his decision of general application, and any efforts for obtaining a reversal of it or an exception in his favor would require time, labor, and expense, with little prospect of success, at least during the term of office of the same Secretary. In the meantime what he had expended in preparing for irrigation might be lost, and some other enterprising citizen might enter the same land by paying the sums exacted, and his opportunity would be lost. The particular lot of land and time of obtaining it might be material to him. He was justified in paying the price and in postponing his remedy therefor to some future day when he could better attend to it. The ruling of tbe Secretary of the Interior was in the nature of compulsion, which the claimant was powerless to resist without sacrificing his rights under the law. We do not think it was his duty to exhaust all means within his power (if any there were) *142 .to obtain Ms rights, but was justified iu paying’ the price exacted by the receiver as upon compulsion, and to abide Ms time for bringing an action to recover back the excess.
The defendants, having received money of the claimant upon the erroneous construction of a statute by a public officer, can not in good conscience retain it.
Thatthe Government could not have recovered if the mistake had been the other way and the claimant had paid less than the statute price is not a sound argument. The Government is frequently estopped by the errors of its officers in paying out money on misconstruction of statutes under high executive authority by which innocent parties have been misled (Hartson’s Case, 21 C. Cls. R., 451), but it does not therefore follow upon any principle of law or justice that parties who have paid too much by the actions of officers are estopped, within the period of limitation, from maintaining suits for overpayment.
Ilad there been any discretion in the Secretary or receiver to fix any price other than that named in the act, then the parties would have stood on equal footing. There was no such discretion, and the decision by the Secretary was an official act within the scope of his authority, and was final for executive purposes. The claimant had no part in making it and was not bound by it, but could not then resist.
Congress, the lawmaking power, alone had the right to establish the price of the laud, and, having established it, no public officer had authority to make a change. The Secretary of the Interior is not the Government. Being charged with the duty of executing the law, he had the power, 'but not the right, to double the price fixed by law and to exact from the claimant the excess which he paid.
The conclusion of the court is that the claimant recover the sum of $799.