Peelle, J.,
delivered the opinion of the court:
The claimant avers in his petition inter alia that on December 28,1888, he entered the NE. of sec. 27, T. 8 S., R. 22 W., *81 Gila and. Salt River meridian, in tbe Territory of Arizona, containing 160 acres, under the provisions of Revised Statutes, section 2301, his entry being known as a cash entry No. 608, Tucson land office; that he was charged by the receiver of said land office and actually paid into his hands the sum of $400, being at the rate of $2.50 per acre for said lands, and that the money so paid to said receiver was turned over to the clefendants; that the ordinary price of public lands of the United States is $1.25 per acre, but that when said lands are situated within the limits of a railroad grant the price fixed by law is $2.50 per acre; that subsequently to making his said entry.the claimant ascertained that the lands so entered by him were not within the limits of any railroad land grant, and thereupon, on November 4,1890, he made application to the Commissioner of the General Land Office for the repayment to him of the sum of $1.25 per acre, under the provisions of the Act of June 16, 1880, section 2 (21 Stat. L., 287); that on the 8th of November, 1890, the Commissioner of the General Land Office refused to make said repayment, whereupon he appealed to the Secretary of the Interior, who, on the 2d of January, 1892, approved and affirmed said decision.
The facts are substantially these:
Congress, by the Act March 3, 1871, section 9 (16 Stat. L., 576), granted, as therein provided, to the Texas Pacific Railroad Company, in aid of the construction of the railroad and telegraph line therein provided for, “ every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as such line may be adopted by said company, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad in California.” * * *
Soon after the passage of this act the company, in compliance with the provisions of section 12 of the act, designated the general route of its road and filed a map of the same in the Interior Department. November 16, 1871, the Secretary of the Interior caused the lands within 40 miles on each side of said designated route within the territories and 20 miles within the State of California to be withdrawn from preemption, private entry, and sale, as in said section *82 provided. At the same time he fixed the price of the even-numbered sections within the limits of the grant at $2.50 per acre, and caused the register and receiver of the local land office at Prescott, Ariz., to be advised by letter of that date of his action.
By the Act February 28, 1885, section 1 (23 Stat. L., 377), all lands granted to the Texas Pacific Railroad Company under the act March 3,1871, were declared forfeited and restored to the public domain and made subject to disposal under the general laws of the United States as though said grant had never been made, “provided that the price of the lands so forfeited and restored shall be the same as heretofore fixed for the even sections within said grant.”
Long after the passage of this forfeiting act, to wit, December 28,1888, the claimant entered, within the limits of the grant theretofore made, as shown by the map of general route filed, the real estate described in his petition, and paid therefor $2.50 per acre. He subsequently made application to the Commissioner of the General Land Office, under the provisions of section 2 of the act June 16,1880, for a repayment to him of $1.25 per acre, on the ground, as averred in his petition, “ that subsequently to making his said entry the petitioner ascertained that thé land so entered by him was not within the limits of any railroad land grant,” which repayment was denied by the Commissioner and his decision was affirmed by the Secretary of the Interior.
It will be observed that all lands granted to the Texas Pacific Railroad Company by the act of 1871 were, by the act 1885, forfeited and restored to the public domain more than three years before the claimant entered and paid for the lands described in his petition, so that at the time of the purchase of the land the same was not within the limits of any grant of lands to the Texas Pacific or any other railroad company, and for this reason the defendants’ counsel contends that this action can not be maintained under the provisions of section 2, Act June 16, 1880 (21 Stat. L., 287), which reads:
“Sec. 2. In all cases where homestead or timber-culture or desert-land entries or other entries of public lands have heretofore or shall hereafter be canceled for conflict, or where from any cause the entry has been erroneously allowed and can not ,be confirmed, the Secretary of the Interior shall cause to be *83 repaid to the person who made such entry, or to his heirs or assigns, the fees and commissions, amount of purchase money, and excesses paid upon the same upon the surrender of the duplicate receipt and the execution of a proper relinquishment of all claims to said land, whenever such entry shall have been duly canceled by the Commissioner of the General Land Office; and in all cases where parties have paid double minimum price for the land which has afterwards been found not to be within the limits of a railroad land grant, the excess of one dollar and twenty-five cents per acre shall in like manner be repaid to the purchaser thereof, or to his heirs or assigns.”
The latter clause of the section is the only one important in this case.
At the time the claimant entered and paid for the land in December, 1888, he ivas bound to know, as the defendants contend, that all lands which had been granted to the Texas Pacific Railroad Company by the act 1871 had been forfeited by the act 1885, and that the price of such forfeited lands so restored to the public domain had been fixed by the act, “the same as heretofore fixed for the even sections within said grant. ”
The reasonable and perhaps obvious construction of the language of the latter clause of the section is, that where parties have paid double minimum price for land supposed to be within the limits of a railroad land grant, as indicated by the general route designated by map filed, and such route is subsequently varied by definite location or by the actual' construction of the road, so that the land entered and paid for is afterwards “found not to be within the limits of a railroad grant,” the excess of $1.25 per acre shall be repaid to the purchaser. The language of the clause, however, presupposes an existing law making such grant, and that at the time of the payment of the double minimum price such land was supposed to be within the limits of the lands thus granted. But where there is no existing law making such grant, and the price of such land is otherwise fixed at $2.50 per acre, no such supposition can be indulged in, and the averments in the petition are therefore defective.
But this court not being bound by the technical rules of pleading (Burns v. United States, 12 Wall., 246; and Cole’s Case, 29 C. Cls. R., 47), the claimant, if he paid $2.50 per acre for public land for which the price of $1.25 per acre was fixed by law as averred in his petition, would have a right to maintain *84 bis action to recover tbe excess, under the general jurisdiction of the court, as in the Healy Case (29 C. Cls. R., 115).
We will proceed to consider the remaining- question in the case, i. e., what is meant by the proviso to Section I, act February 28,1885. That section is as follows:
“That all lands granted to the Texas Pacific Eailroad Company under the act of Congress, entitled {An act to incorporate the Texas Pacific Eailroad Company and to aid in the construction of its road and for other purposes,’ approved March 3,1871, and acts amendatory thereof or supplemental thereto, be, and they are hereby, declared forfeited, and the whole of said lands restored to the public domain and made subject to disposal under the general laws of the United States, as though said grant had never been made: Provided, That the price of the lands so forfeited and restored shall be the same as heretofore fixed for the even sections within said grant.”
If the act had omitted the proviso there would be no question but that the land so forfeited would have been subject to disposal under the general laws of the United States — that is, at $1.25 per acre, the same as though the grant had never been made.
The proviso is a limitation, not upon the language of the forfeiture and restoration of such lands to the public domain, but upon the language subjecting the lands to disposal under the general laws of the United States,- and therefore to ascertain what the proviso means it is necessary to first ascertain whether or not a price had theretofore been fixed “for the even sections within said grant,” and, if so, what such price was. Congress intended the proviso for some purpose. It was clearly not necessary to fix the price of such restored lands at $1.25 per acre, as upon the restoration of such lands to the •public domain they were “ made subject to disposal under the general laws of the United States, as though said grant had never been made.” What was in the minds of the legislators at the "time, the court can only ascertain from the language used. The language itself is plain. The only question is, Was there at the time any law to which the proviso applies fixing the price of the “even sections within said grant?”
In the absence of statutory authority therefor, it is not within the scope or power of any officer of the United States to fix the price at which the public lands may be sold, and this we take to be so elemental that it is unnecessary to cite *85 authorities, but see Healy’s Case (29 C. Cls. R., 115). The proviso does not say that the price of lands so forfeited and restored shall be the same as that heretofore fixed by the Secretary of the Interior, but simply that the price “shall be the same as heretofore fixed for the even sections within said grant.”
By the Act April 24, 1820, section 3 (3 Stat. L., 566), the minimum price of the public lands was fixed at $1.25 per acre, whether sold at public or private sale.
By the Act September 24,1841, sectivn 10 (5 Stat. L., 455), now Revised Statutes, sections 2257 to 2262, citizens or those who, conformably to the naturalization laws, had declared their intention to become such, were granted the right of preemption, except as to lands reserved as therein set forth, to not exceeding 160 acres of land upon the conditions therein stated and upon the payment of the minimum price of such land.
The Act March 3, 1853 (10 Stat. L., 244), reads:
“ That the preemption laws of the United States, as they now exist, be, and they are hereby, extended over the alternate reserved sections of public lands along the lines of all the railroads in the United States wherever public lands have been or may be granted by acts of Congress; and that it shall be the privilege of the persons residing on any of the said reserved lands to pay for the same' in soldiers’ bounty land warrants, estimated at a dollar and twenty-five cents per acre, or in gpld and silver, or both together, in preference to any other person, and at any time before the same shall be offered for sale at auction: Provided, That no person shall be entitled to the benefit of this act who’has not settled and improved, or shall not settle and improve, such lands prior to the final allotment of the alternate sections to such railroads by the General Land Office: And provided further, That the price to be paid shall in all cases be two dollars and fifty cents per acre, or such other minimum price as is now fixed by law, or may be fixed upon lands hereafter granted; and no one person shall have the right of preemption to more than one hundred and sixty acres: And provided further, That any settler who has settled or may hereafter settle on lands heretofore reserved on account of claims under French, Spanish, or other grants which have been or shall be hereafter declared by the Supreme Court of the United States to be invalid, shall be entitled to all the rights of preemption granted by this act and the act of fourth of September, eighteen hundred and forty-one, entitled ‘An act to appropriate the proceeds of the public lands and to grant preemption rights,’ after the lands shall have been released *86 from reservation, in the same manner as if no reservation-existed.” (Now Eev. Stat., sections 2279 and 2280.)
Thus in express terms the latter act extended the preemption laws “over the alternate reserved sections of public lands along the lines of all the railroads in the United States where-ever public lands have been or may be granted by acts of Congress;” and while providing a preference to those paying in soldiers’ bounty land warrants, “the price to be paid shall in all cases be $2.50 per acre, or such other minimum price as is now fixed by law or may be fixed upon lands hereafter granted.” * * *
By this act, therefore, the price of “the alternate reserved sections of public lands along the lines of all the railroads in the United States, wherever public lands have been or may be granted by acts of Congress” was fixed at $2.50 per acre, unless in conflict with “ such other minimum price” as was then or might thereafter be fixed by any law making grants to railroads, in which case the price of such alternate reserved sections as fixed in the granting acts was to control. In other words, Congress by this general act extending the preemption laws over the alternate reserved sections of public lands along the lines of land-grant railroads, did not intend to change the price as fixed in the acts making such grants, so that if at the time of the passage of the act, the price of such alternate reserve sections was fixed in any granting act, the latter was to control, while as to subsequent acts, as a matter of course the later statute would control.
By the Act May 20, 1862 (12 Stat. L., 392), now Revised Statutes, sections 2289 to 2317, the policy of disposing of the unappropriated public lands to actual settlers for the purpose of procuring homesteads, as therein provided, was adopted.
The grant to the Texas Pacific Railroad Company by the Act March 3, 1871, section 9 (16 Stat. L., 576), was as follows:
“ That for the purpose of aiding in the construction of the railroad and telegraph line herein provided for, there is hereby granted to the said Texas Pacific Railroad' Company, its successors and assigns, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as such line may be adopted by said company, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad in California, where *87 tbe same shall not have been sold, reserved, or otherwise disposed of by the United States, and to which a preemption or homestead claim may not have attached at the time the line of said road is definitely fixed. In case any of said lands shall have been sold, reserved, occupied, or preempted, or otherwise disposed of, other lands shall be selected in lieu thereof by said company, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections first above named, and not including the reserved numbers. If, in the too near approach of the said railroad line to the boundary of Mexico, the number of sections of land to which the company is entitled can not be selected immediately on the line of said railroad, or in lieu of mineral lands excluded from this grant, a like quantity of unoccupied and unappropriated agricultural lands, in odd-numbered sections nearest the line of said railroad may be selected as above'provided; and the word ‘mineral,’ where it occurs in this act, shall not be held to include iron or coal: Provided, however, That no public lands are hereby granted within the State of California further than twenty miles on each side of said road, except to make up deficiencies as aforesaid, and then not to exceed twenty miles from the lands originally granted. The term 4 ship’s channel,’ as used in this bill, shall not be construed as conveying any greater right to said com-, pany to the water front of San Diego Bay than it may acquire by gift, grant, purchase, or otherwise, except the right of way as herein granted: And provided further, That all such lands, so granted by this section to said company, which shall not be sold, or otherwise disposed of, as provided in this act, within three years after the completion of the entire road, shall be subject to settlement and preemption like other lands, at a price to be fixed by and paid to said company, not exceeding an average of two dollars and fifty cents per acre for all the lands herein granted.”
Section 12 of the act was as follows:
“ That whenever the said company shall complete the first and each succeeding section of twenty consecutive miles of said railroad and put it in running order as a first-class road in all its appointments, it shall be the duty of the Secretary of the Interior to cause patents to be issued conveying to said company the number of sections of land opposite to and coterminous with said completed road to which it shall be entitled for each section so completed. Said company, within two years after the passage of this act, shall designate the general route of its said road, as near as may be, and shall file a map of the same in the Department of the Interior; and when the map is so filed, the Secretary of the Interior, immediately thereafter, shall cause the lands within forty miles on each *88 side of said designated route within the Territories, and twenty miles within the State of California, to be withdrawn from preemption, private entry, and sale: Provided, however, That the provision of the act of September, eighteen hundred and forty-one, granting preemption rights, and the acts amend-atory thereof, and of the act entitled, ‘An act to secure homesteads to actual settlers on the public domain,’ approved May twenty, eighteen hundred and sixty-two, and the amendments thereto, shall be, and the same are hereby, extended to all other lands of the United States on the line ol said road when surveyed, except those hereby granted to said company.”
Soon after the passage of this act, and within two years therefrom, the Texas Pacific Railroad Company, as in section 12 provided, “designated the general route of its said road” and filed “ a map of the same in the Department of the Interior.” And immediately thereafter, to wit, November 16, 1871, the Secretary of the Interior, as therein directed, caused the lands therein specified to be withdrawn from preemption, private entry, and sale, and fixed the price of the even-numbered sections within the grant at $2.50 per acre, to be disposed of at “that ratability and under the preemption and homestead laws only.” This action was communicated to the register and receiver of the local land office at Prescott, Ariz. So much of the letter as is material here is as follows:
“Department op the Interior,
“G-eneral Land Qppioe,

“November 16,1871.

“Register and Receiver,

“Prescott, Arizona.

“Gentlemen : The Texas Pacific Railroad Company having filed a map of the proposed line of their road from El Paso to San Diego, Cal., as required by the 12th section of the granting act March 3,1871,1 herewith transmit a map showing as near as may be, the line of said road -through the Territory of Arizona, together with the limit of 40 miles on each side of the route, and in accordance with the requirements of the act you are hereby directed to withdraw from preemption or homestead entry or sale all the odd-numbered sections of land falling within said limits. The even-numbered sections you will hold at the double minimum price of $2.50 per acre, and dispose of at that ratability and under the preemption and homestead laws only. * * *
“Yery respectfully, “Willis Drummond,
“ Commissioner.”
*89 The Commissioner does not refer to any act of Congress under which the Secretary acted in fixing the price of the even-nurnbered sections within the limits of the grant shown by the map filed; but by reference to the act March 3,1853, hereinbefore set out, it will be observed that the preemption laws of the United States were “ extended over the alternate reserved sections of public lands along the lines of all the railroads in the United States wherever public lands have been or may be granted by acts of Congress,” and by reference to section 12, act 1871, hereinbefore set out, it will be seen that the provisions of the preemption and homestead acts 1841 and 1862 (supra) were extended to all the lands along the line of the Texas Pacific Bailroad Company not granted thereto by the act 1871, thus in effect incorporating into the act 1871 the provisions of the acts 1841 and 1862 as modified by the act 1853; and such was evidently the views of the Secretary of the Interior when he fixed the price of the even-numbered sections along the line of the road at $2.50 per acre and to be disposed of under the preemption and homestead laws only.
By the Act April 24,1820 (supra), the price of the public lands of the United States, as before stated, was fixed at $1.25 per acre, but when Congress commenced to grant lands to aid in the construction of railroads, they adopted the policy of granting to such roads the alternate sections within specified limits, and fixed the price of the remaining or reserved sections within such limits at $2.50 per acre, thereby reimbursing the Government for lands so granted. We will refer to some of these acts:
By the Act September 20, 1850 (9 Stat. L., 466), Congress granted to the State of Illinois, for the purpose of aiding in the construction of a railroad (Illinois Central), every alternate section within certain limits, and by section 3, the lands remaining to the United States were fixed at the double minimum price; and this course was pursued in the Act June 10, 1852 (10 Stat. L., 9), making the grant to the State of Missouri, and also in subsequent acts. By the act March 3, 1853, however, the price of the “ alternate reserved sections of public lands along the lines of all the railroads in the United States wherever public lands have been or may be granted by acts of *90 Congress,” was, in conformity to the preceding acts, fixed at $2.50 per acre, as therein, provided, so that at the time of the passage of the act 1871, making-, the grant to the Texas Pacific Railroad Company, the price of the reserved sections within the limits of the grant was nob in terms fixed in the granting act. But it is reasonable to presume that Congress intended that the price fixed in the general act 1853 should be applicable to such lands, especially as there was no other law at the time fixing the price of such alternate reserved sections of land in conformity with the policy of Congress in reimbursing the Government for lands granted to aid in the construction of railroads -, and there is nothing in the act indicating an abandonment by Congress of that policy.
Congress certainly never intended that upon the withdrawal of the alternate sections granted to the company, the reserved or even-numbered sections should be withdrawn from market to await the definite location of the road by actual construction or otherwise, nor do we think Congress intended that after the withdrawal of the alternate sections so granted thereserved sections should be sold at $1.25 per acre, as such sales would have defeated the policy of the law seeking reimbursement for lands thus granted.
We conclude, therefore, that after the designation of the general route of the road, the filing of the map thereof, and the withdrawal of the alternate sections, as provided in section 12, the reserved or even-numbered sections within the limits of the grant shown by the map filed were subject to sale under the provisions of the preemption and homestead laws, as modified by the act 1853, and that the Secretary of the Interior was therefore authorized to fix the price of the reserved sections at $2.50 per acre.
He having done so, we think his action comes within the well-known rule “that the contemporaneous construction of a statute by those charged with its execution * * * is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous.” (United States v. Johnston, 124 U. S., 236, 253, and earlier authorities therein cited.)
If, however, we are mistaken in this view, then there can be no doubt but that the proviso to Revised Statutes, section 2357, which became a law upon the passage of the Revised Statutes *91 in 1874, did fix the price of such reserved lands in these words: “Provided, That the price to be paid for alternate reserved lands, along tbe line of railroads within the limits granted by any act of Congress, shall be two dollars and fifty cents per acre.” ,
Referring to this statute, however, the claimant in his brief says:
“We have here for the first time a general statute fixing the price of reserved alternate sections at $2.50 per acre; but the proviso never became applicable to the Texas Pacific grant and never determined the price of a single section supposed to be within that grant for the reason that the Texas Pacific Company, as shown by the record, never filed its map of definite location, which was required by the act before it could ever be known what were the ‘reserved alternate sections’ or what was the line of the railroad or the limits of the grant.”
And in support of this contention he cites Kansas Pacific Railway Company v. Dunmeyer (113 U. S., 629, 640), where it is said, “When the line was fixed, which we have already said was by the act of filing this map of definite location in the General Land Office, then the criterion was established by which the lands to which the road had a right were to be determined.” And again, page 641, it is said “the company had no absolute right until the road was built, or that part of it which came through the land in question.” And such is the effect of the decision in Buttz v. Northern Pacific Railroad (119 U. S., 55, 71), cited by claimant. But these decisions are dealing with the rights of the companies in and to the lands granted and not with the reserved sections in which they had no interest. .
Inasmuch, therefore, as the company could have acquired “no absolute right” to any of the lands granted, to aid in the construction, “until the road was built,” it is difficult to see the value of the map of definite location except as establishing a criterion “by which the lands to which the road had a right were to be determined,” and this view is supported by the language in section 9 of the act, for by that section there was granted “every alternate section of public land, not mineral, designated by odd numbers” within specified limits, “where the same shall not have been sold, reserved, or otherwise disposed of by the IJnited States, and to which a preemption or homestead claim may not have attached at the time the line of *92 said road is definitely fixed,” thereby showing that the rights of the company in and to the lands granted were to be determined as against a preemption and homestead claimant as from the time of the definite location of the road. But this was a limitation upon the rights of the company in and to the lands granted, and not a limitation upon the United States as to the disposition they should make of the reserve lands.
As heretofore said, if the proviso to section 1, act 1885, had been omitted, there would be no question but that the lands thereby forfeited and restored to the public domain would have been subject to sale at $1.25 per acre, but when Congress added the proviso thereto fixing the price of the lands so forfeited and restored “the same as heretofore fixed for the even sections within said grant,” they thereby, in effect, construed the act 1853, and the action of the Secretary of the Interior thereunder, as well as the proviso to Revised Statutes, section 2357, as applicable, to the “even sections within said grant,” and thereby fixed the price of such lauds at $2.50 per acre, notwithstanding the forfeiture.
These were the only statutes in force fixing the price of the “even sections within said grant,” and hence the only statutes to which the proviso could apply.
At the time of the passage of the act of forfeiture Congress knew that the railroad had not been constructed. It was for this very reason that the lands granted thereto were forfeited and restored to the public domain; and it is reasonable to presume that when the act of forfeiture was passed Congress took into consideration the time which had elapsed since the passage of the granting act, the probable sales of the reserved lands at $2.50 per acre, and whether or not the lands thereby granted and withdrawn from the market in 1871, had during the interim increased in value from any cause. Especially would they take into consideration the construction by the Southern Pacific Company of a railroad substantially over the route contemplated by section 1, act 1871, which was before them in House Report No. 1803, Foi’ty-seventh Congress, first session, and of which railroad the court takes judicial notice. So that whatever may have been the legal status of any who may have purchased of the reserved lands prior to the forfeiture, the proviso to the act making the price of the lands *93 thereby forfeited and restored “tbe same as heretofore fixed for the even sections within said grant” thereby determined that those who thereafter purchased such forfeited lands should pay $2.50 per acre therefor.
This would also seem to be the view Congress took of the matter, for by the Act of March 2, 1889, section 4 (25 Stat. L., 854), the price of all lands within the limits of any grant of lands “to aid in the construction of railroads, which have been heretofore and which may hereafter be forfeited, which were by the act making such grants or have since been increased to the double minimum price,” was fixed at $1.25 per acre.
The claimant’s entry and purchase was more than three years after the act of forfeiture was passed, and was of a quarter section which had been thereby forfeited and restored to the public domain.
At the time of his entry and purchase, therefore, he was bound to know that the lands which he purchased had ceased to be lands granted to aid in the construction of a railroad, especially as the land which he purchased was within an odd section, and that the price of the lands so forfeited and restored was fixed, by reference to other acts, at $2.50 per acre.
If, therefore, the provisions of section 2, act 1880, under which the claimant seeks relief, are in conflict with the provisions of the proviso to section 1, act 1885, as we think they are, the former must give way under the well-known rule of construction that “ subsequent legislation repeals previous inconsistent legislation, whether it expressly says so or not.” (Section 182, Endlich on Interpretation, etc.)
We heed not, however, go so far in the case at bar, for while we hold that the claimant is not entitled to relief under the act 1880, by reason of the proviso to the act 1885, fixing the price of the forfeited lands, by reference to other statutes, at $2.50 per acre, there may be cases where the differing conditions as to other forfeited lands might entitle a litigant to relief; so that, so far as the case at bar is concerned, we hold that the proviso to the act 1885 did fix the price of the forfeited lands, by reference to other existing statutes and the action of the Secretary of the Interior thereunder, at $2.50 per acre, and that the act 1880, therefore, does not apply to such lands, *94 and, tlie claimant not being otherwise entitled to relief, his petition is dismissed.